# EXHIBIT G

# Expert Report of John Ulzheimer

## In Re: Coulter v. Chase Bank USA, N.A.

**June 17, 2019**

# I.   QUALIFICATIONS

### A.     Employment History

I have worked in the consumer credit industry since November of 1991. I spent six years with Equifax Credit Information Services and spent several of those years both performing the consumer dispute process and managing a team of consumer service agents that also performed the consumer dispute process, including disputes related to identity theft and fraud. My team and I also handled the process of generating the appropriate dispute forms, manual verification, credit report corrections, and disclosures to consumers. While at Equifax, I gained an intimate understanding of how credit files are compiled, stored, retrieved, and delivered. I also sold various Equifax Credit Marketing Services (CMS) products, which included lists for preapproved credit card offers.

At FICO (formally known as Fair Isaac Corporation and best known for its FICO credit scores), I spent an additional seven years gaining an intimate understanding of credit scoring, including how credit scores are designed, developed, used by lenders, and impacted by the information in consumer credit files. From time to time, I was involved with the development of FICO credit bureau scorecards, which are the heart of credit scores.

At Credit.com, I spent six years teaching consumers and the media how the consumer credit system works, including topics such as credit reporting, credit scoring, credit cards, and debt settlement, to name but a few. I was also the developer of the Credit Report Card, a credit-scoring tool that interprets Trans Union credit data like how a credit-scoring model would, and then gives the consumer an easy to understand summary of their credit risk. The tool won several awards in 2009 when it was released.

As a former employee of Equifax, Fair Isaac, and Credit.com, I have worked with, helped train, and supervised employees on processes and procedures involved in credit reporting, credit report dispute resolution, Fair Credit Reporting Act compliance, credit score model design and development, and consumer credit risk management.

I am also familiar with general underwriting practices, including what prospective lenders consider when determining credit risk. This includes a general understanding of what lenders consider important and not so important when considering a consumer's credit report. I gained this knowledge from many years of working with various lenders during my employment with Equifax, Fair Isaac, and Credit.com. In fact, during the first four years of my time at Fair Isaac, I taught members of the mortgage industry how to properly implement credit scoring into their processes. At the time, Fannie Mae and Freddie Mac had just mandated the use of FICO scoring in their two desktop underwriting systems, Loan Prospector and Desktop Underwriter. My role, among other things, was to teach industry trade associations, large national mortgage lenders, Fannie Mae, and Freddie Mac how FICO scoring worked, how consumer risk changed as deal variables changed, and how to educate their home-buying customers on the importance of solid credit management.

### B.     Presentations and Academia

I have made hundreds of credit reporting and credit scoring presentations during my time working in the credit industry. These presentations were delivered to consumers, consumer

groups, credit counselors, credit reporting agencies, nationally recognized lenders, members of the press, members of Congress, and banking authorities, and were of varying levels of complexity depending on the audience.

I frequently guest lecture about credit reporting and credit scoring at both The University of Georgia and The Westminster Schools in Atlanta. I have also taught at Emory University's Center for Lifelong Learning, where I was rated by the students as the top instructor in the Personal Finance and Investments category during the 2005-06 term. In April 2016 I began guest lecturing to 2nd and 3rd year students at the Emory University School of Law. I also volunteer my time teaching credit reporting and credit scoring fundamentals to members of the Georgia Consortium on Personal Financial Literacy.

I received a Bachelor of Science in Criminal Justice from the University of West Georgia in June 1991. I am currently a graduate student at Penn State pursuing a Masters in Criminal Justice Policy and Administration. I am well qualified to interpret and discuss the issues at hand in this case. My background and qualifications are set forth in my resume, which is attached as Exhibit A.

### C.  Publications

I am a frequent contributor on consumer credit issues to USA Today, New York Times, Wall Street Journal, Chicago Tribune, Los Angeles Times, Washington Post, Money Magazine, American Banker, SmartMoney, MarketWatch, CNN.com, MSNBC.com, Bankrate.com, and other regional business and consumer media outlets.

I have written the following books and training manual on the same topics, including *You're Nothing but a Number* (2007), *The GetCreditWise Tool Kit* (2007), *Surviving Identity Theft* (2007 w/ Emily Peters), and my most recent book, *The Smart Consumer's Guide to Good Credit: How to Earn Good Credit in a Bad Economy* (2012).

I have been a full time author since 2004 and the number of my publications to date is approximately 4,500. I currently write or have written regular articles on credit issues for newsletters, websites, and blogs, including a monthly column, "Ask John," for Credit.com's monthly e-newsletter, for Boardroom, Inc.'s monthly newsletter, *BottomLine Personal*, and for CreditBloggers.com, Credit.com, Enloop.com, CNBC.com, IMS Expert Services Newsletter, Mint.com, SmartCredit.com, CreditSesame.com's blog, the National Foundation for Credit Counseling's Financial blog, Credit Card Insider, Sky Rocket Media, The New York Times, JD Byrider's blog, MagnifyMoney, The Simple Dollar, Zillow, and VantageScore Solutions.

### D.  Certifications

Twice, I have been Fair Credit Reporting Act (FCRA) certified by the credit reporting trade association, the Consumer Data Industry Association (CDIA), and its predecessor, the Associated Credit Bureaus (ACB). The FCRA Certificate Program was developed to prepare consumer reporting agencies and companies that furnish information to the consumer reporting agencies to meet the requirements set forth in the FCRA. The course covers how consumers, credit grantors, and those who use and furnish information to consumer reporting agencies are affected by the FCRA.

### E.     Previous Expert Witness Work and Testimony

I have served as an expert witness in more than 370 lawsuits concerning credit issues and have been qualified to testify as an expert in both Federal and state courts. I have served as an expert for both plaintiffs and defendants, and for creditors and consumers. A list of matters on which I have testified in the last four years is attached as Exhibit B to this report.

## II.     SCOPE OF WORK

I was retained by counsel for Defendant Chase Bank USA, National Association ("Chase") and asked to provide an expert opinion, generally, on credit reporting, credit scoring, Metro 2, the dispute resolution process, and credit damages.  I was also asked to offer other opinions supported by discovery documents, and provide rebuttal opinions, if needed.

## III.    COMPENSATION

I am being paid $495 per hour for all work performed. I have no financial interest in the outcome of this matter.

## IV.    DOCUMENTS REVIEWED

A list of documents and other information upon which I have considered and relied in forming my opinions set forth in this Report are attached as Exhibit C.

## V.     SUMMARY OF OPINIONS

Having reviewed the facts and materials in this case and based on my analyses presented in this Report, it is my opinion that:

1.  Metro 2 is the one and only credit reporting language used by the credit reporting agencies and their data furnishers. In Metro 2 there is no such field or date as a so-called "Date of Status." Because there is no such "Date of Status", furnishers like Chase cannot report, update, delete, investigate, or modify a "Date of Status."

2.  Chase is directed by the credit industry's trade association, via their Credit Reporting Resource Guide standards' manual, to **not** mark accounts as being "in dispute" in response to indirect disputes filed with credit reporting agencies.

3. There is no evidence the Plaintiff experienced any damages as a result of Chase's actions, including any negative impact to her credit scores.

## VI.    COMPLETE STATEMENT OF ALL OPINIONS AND BASIS FOR OPINIONS

### A.     Background Regarding the Credit Reporting Industry

#### 1.     Credit Reporting Agency Background

A credit report is a record of an individual's current and past financial liability experience. The report includes information about a consumer's personal identity, their employment, collection agency accounts (if any), public records (liens, judgments, and bankruptcies only), as well as their account history (also called "trade"). There are a number of companies that maintain consumer credit files and generate credit reports when requested by the consumer, a lender, an insurer, or another organization with a right to view such data.

These companies are called credit reporting agencies, consumer reporting agencies, or credit bureaus. They collect and store credit data and then generate and deliver credit reports using that data in response, for example, to requests from lenders or insurance companies who have received an application for credit or to bind insurance. There are three major, commonly recognized credit reporting agencies in the United States: Equifax, Experian, and Trans Union. Equifax, a public company, is headquartered in Atlanta, Georgia. Experian, a public company in the U.K., has its U.S. headquarters in Costa Mesa, California. Trans Union, a public company, is headquartered in Chicago, Illinois. Each of the three companies maintains over 200 million credit files. There are roughly 600-675 million consumer credit files in circulation.

### 2.      Data Furnisher Background

Information that is sent to the credit reporting agencies comes from companies generally referred to as "data furnishers." These companies are almost always going to be some sort of financial institution (e.g., a bank, credit union, finance company, or credit card issuer) or a debt collector. These furnishers will generally send their customer or debtor's account information to the credit reporting agencies once every statement cycle period, which is normally once per month.

The furnisher's information is normally sent to the credit reporting agencies via a magnetic tape or a system-to-system communication system. Once the credit reporting agency receives the furnisher's information, they will load it into their credit file database and disclose it on a consumer's credit report when requested.

The language furnishers use to communicate their customers' or debtors' information to the credit reporting agencies is called Metro 2. This language is the industry standard. Metro 2 consists of codes and characters which the furnisher uses to populate "cells" or data fields defined by the credit reporting agencies, and the credit reporting agencies then display the furnisher's account information on consumer credit reports and disclosures.

Every year the Consumer Data Industry Association ("CDIA") publishes a manual called the Credit Reporting Resource Guide or, informally, the Metro 2 Manual. This manual, which is approximately 290 pages, contains not only the Metro 2 language field layout but also a comprehensive list of the numerous codes used to report information to the credit reporting agencies, and a description of the conditions or scenarios when the codes should be used.

### 3.      Preparation of Credit Reports

A credit report is normally delivered to the lender, insurance company, consumer service provider or other requesting party when a consumer submits an application for some sort of benefit, such as a home loan, auto loan, credit card, subscription service, or insurance. The requestor or lender, referred to by the credit bureaus as a subscriber or user, submits a request for the consumer credit file. Using proprietary search logic, the credit bureau compiles a credit report using its stored data. This process is virtually instantaneous, giving lenders the ability to make instant credit decisions.

The information in a consumer credit report can be scored using a sophisticated algorithm called a credit-scoring model. The report and credit score are then used by lenders to determine an individual's credit risk. The information in a consumer credit report is not "real time," meaning it is not updated dynamically.

### 4.    Credit Scoring

A credit score is a number that summarizes an individual's credit risk based on a snapshot of his or her credit report at some point in time. A credit score helps lenders evaluate an individual's entire credit report *by estimating his or her likelihood of becoming 90 days late or worse on any credit obligation in the 24 months after the score is calculated*. The most widely used credit scores are FICO scores, the credit scores created by FICO (formerly known as Fair Isaac Corporation) and my former employer. Lenders can buy FICO scores from any of the three major credit reporting agencies. FICO develops its scores based on information in the consumer credit files maintained by the credit reporting agencies. A credit score may influence the credit available to the consumer and the terms that lenders offer to the consumer (e.g., interest rate, credit limits). Credit scores can be calculated using different scoring models, although FICO is the standard in the United States, Canada, and other countries that maintain sophisticated credit reporting systems.

### a.    Factors Affecting Credit Scoring

FICO scores take into account a number of credit report components. Those components that contribute to a FICO credit score and the relative weight of each (expressed as a percentage) are:

35% – **Payment History**: The presence or lack of negative information
30% – **Debt**: How much and what type
15% – **Length of Credit History**: How long an individual has had credit
10% – **Account Diversity**: The variety of credit experiences
10% – **Hard Inquiries**: A record of when an individual's credit report is accessed

**Payment History (35%** contribution on the FICO scale) – A record of negative information can potentially lower a consumer's credit rating or score. In general, risk scoring systems look for any of the following negative events: charge-offs, collections, late payments, repossessions, foreclosures, settlements, bankruptcies, liens, and judgments. Within this category, FICO considers the severity of the negative item (minor derogatory versus major derogatory), the age of the negative items, and the prevalence of multiple negative items.[1]

**Debt (30%** contribution on the FICO scale) – FICO considers the amount and type of debt carried by a consumer. There are three types of debt considered:

---

1. In the FICO and VantageScore scoring systems, a severe or major derogatory is anything that is currently past due, historically 90 days past due or worse, a public record, a collection, or any account status or narrative that indicates default or severe delinquency (e.g., repossession, foreclosure, settlement/short sale, collections, charge-offs). Historical 30 and 60 day delinquencies are considered to be minor derogatory events.

**Revolving debt:** This is credit card, retail card, and some gas card debt. While home equity lines of credit have revolving terms, the bulk of debt considered in this category is unsecured revolving debt incurred on "plastic." The most important measurement from this category is called "Revolving Utilization," which is the relationship between the consumer's aggregate credit card balances and available credit card limits, also called "open to buy." This is expressed as a percentage and is calculated by dividing aggregate credit card balances by aggregate credit limits and multiplying the result by 100, yielding the Revolving Utilization percentage. The higher the percentage, the lower an individual's FICO score likely will be. This is why simply closing credit cards is generally not a good method for improving one's credit score. Closing one or more credit card accounts will reduce an individual's total available credit limit and, in turn, likely increase the individual's Revolving Utilization percentage, unless the cardholder also reduces their outstanding balances as well.

**Installment debt:** This is debt where there is a fixed payment for a set period of time, such as an auto loan requiring the same payment for 36, 48, or 60 months.

**Open debt:** This is the least common type of debt. Open debt must be paid in full each month. A certain variety of credit cards require a consumer to "pay in full" each month. The American Express Green card is a common example.

**Length of Credit History** (Credit File Age) **(15%** contribution on the FICO scale) – The older an individual's credit report, the more stable it likely is. The credit file "age" is determined by looking at (1) the date the oldest account was opened, and (2) the average age of the accounts in the credit file. The age of the credit file is measured from the oldest account's "date opened" field. The average age is calculated using the "date opened" field on all accounts, whether they are currently open or closed.

**Account Diversity (10%** contribution on the FICO scale) – An individual's credit score will benefit from having a diverse set of account types in his or her credit file. Having experience across multiple account types (revolving, auto, mortgage, etc.) benefits an individual's credit score because the individual is proving an ability to manage different types of debt.

**Hard Inquiries (10%** contribution on the FICO scale) – An inquiry is noted every time a company requests some information from a consumer's credit file. There are several kinds of inquiries that may or may not affect one's credit score. Inquiries that have no effect on the creditworthiness of a consumer (including so-called "soft inquiries") can stay on a credit report for as little as 6 months and are never visible to lenders or credit scoring models. There are several types of soft inquiries:

Prescreening or promotional inquiries, where a credit bureau may sell contact information to credit card companies, lenders, or insurers for consumers who meet criteria set by the inquirer. Pre-approved credit card offers are mailed to consumers identified through a pre-screening or promotional inquiry.

Creditors check current customers' credit files on a periodic basis through an account management, account maintenance, or account review inquiry.

When a consumer checks his or her own credit report it is referred to as a consumer disclosure inquiry.

Employment screening inquiries.

Insurance related inquiries.

Utility related inquiries.

Other types of inquires (known as "hard inquiries") can have an impact on the creditworthiness of a consumer. These inquiries are visible to lenders and credit scoring models. These inquiries usually result from a lender requesting a consumer's credit report when the consumer applies for an extension of credit. Hard inquiries can, but do not always, affect the borrower's credit score. Limiting the number of credit inquiries can help a consumer's credit score.

### b.    Scoring Models

#### i.    Multivariate Systems

Credit scoring models are multivariate, meaning they evaluate a variety of information on a credit report to generate a final score. No single credit item determines an individual's credit score. In fact, the impact of any one item on an individual's credit score is dependent on all of the other items on his or her credit report, and may not have any impact at all.

#### ii.    Multi-Scorecard Systems

Credit scoring models are actually a consolidation of multiple credit scoring systems called scorecards. A scorecard is a credit scoring model designed to evaluate the risk of a group of consumers who have certain similarities in their credit file (homogenous populations). For example, a consumer with a bankruptcy on his credit report is scored using a model or scorecard designed specifically to evaluate the credit risk of consumers who have filed bankruptcy. Similarly, a consumer with limited credit information (known as a "thin file") is scored using a model or scorecard designed to evaluate the credit risk of consumers with thin files. Most credit scoring systems have many scorecards, as there are many unique consumer profiles, each with different risk levels. The selection of the appropriate scorecard is made by the credit scoring system prior to calculating and rendering a final score.

#### iii.    Characteristics, Variables, and Weights

Each scorecard contains a series of characteristics, variables, and weights. A characteristic is a question asked of the credit report by the scoring system. For example, a common characteristic in most credit risk models asks, "how many accounts with a balance are present?"

Other examples[2] include:

Does the consumer have any delinquencies on his or her credit report?
How long has it been since the consumer's most recent delinquency?
Does the consumer have a bankruptcy on his or her credit report?

---

[2] These are intended to illustrate the characteristic, variable and weighting process and is not meant to mimic the variable classing or weights of any particular credit scoring systems.

While these examples are plain English questions, credit scoring systems answer the questions by reading the data embedded in the credit report. Scorecards regularly use at least 12 characteristics, and, in some cases, significantly more.

Each characteristic has what are referred to as variables. Variables are the series of available answers to the characteristics (or questions). The set of potential variables (or answers) to the sample[3] characteristics above might be:

- Does the consumer have any delinquencies on his or her credit report?
  (Yes or No)

- How long has it been since the consumer's most recent delinquency?
  (Less than 36 months ago or More than 36 months ago)

- Does the consumer have a bankruptcy on his or her credit report?
  (Yes or No)

And, while these examples are pretty simple ones, most characteristics have a much larger set of available variables.

Once the credit scoring system has completed the process of selecting the scorecard and determining the proper variable for each characteristic in that scorecard, the model assigns weights or points to each variable. For example, the model might assign points as follows:

- Does the consumer have any delinquencies on his or her credit report?
  If the answer is Yes, 0 points are awarded out of 100.
  If the answer is No, 100 points are awarded out of 100.

- How long has it been since the consumer's most recent delinquency?
  If the answer is Less than 36 months ago, 25 points are awarded out of 75.
  If the answer is More than 36 months ago, 75 points are awarded out of 75.

- Does the consumer have a bankruptcy on his or her credit report?
  If the answer is Yes, 0 points are awarded out of 50.
  If the answer is No, 50 points are awarded out of 50.

Once the model has assigned weights or points to each variable, the points are tabulated, resulting in a final credit score. The entire process is computerized and can be accomplished rather quickly. The credit score is usually appended to a credit report and delivered to the lender for use in risk management decisions.

### 5.        How The Data is Used – Risk Based Pricing

Risk-based pricing is a process used by creditors, insurance companies, landlords, retailers, and utility companies ("data users" or "subscribers"). Data users attempt to measure the downside financial risk of doing business with a particular consumer against upside gain if the product being offered to the consumer is priced appropriately. For example, if a con-

---

3 The preceding and following characteristic and variable breakdowns, as well as the weights assigned on this report are EXAMPLES and do not represent the reality of any credit scoring system. These examples are simply meant to illustrate how a credit-scoring model considers information on a credit report.

sumer presents little risk, a lender can be more aggressive with the interest rate it offers because the consumer's credit score suggests that the consumer will pay on time. If a consumer presents a higher risk, the lender may decline the application or charge a higher interest rate in order to subsidize the risk posed by extending a loan to that consumer. Credit reports and credit scores have become synonymous with credit risk and risk-based pricing.

### 6.    The Dispute Resolution Process

A consumer can challenge information on a credit report by contacting the credit reporting agencies or furnishing party, although the consumer's rights may be different depending on who he or she contacts. A consumer can file a dispute with the credit reporting agencies on their websites, by U.S mail, telephone, or in person.

When a dispute is filed with a credit bureau, several things happen. First, the credit bureau reviews the relevant information sent by the consumer regarding the dispute.  This allows the credit bureau to determine the nature of the dispute, such as whether it's fraud related, a mixed or confused credit report issue, a credit clinic dispute, or some other type of dispute. Once the nature of the dispute is identified the credit bureau will direct it to the appropriate group. Further, consumers may provide supporting documents with their dispute.

When an item is disputed with a credit bureau ("indirect dispute") the item in dispute is generally marked on the credit report as being "in dispute" by appending a specific code to the disputed item. This Compliance Condition Code[4] is represented by the letters "XB." When an XB code appears next to an item in a credit report, that particular item is excluded from any credit score characteristics that measure payment history or debt until the dispute is resolved or closed and the XB code is removed. This allows the credit reporting agency and data furnisher to conduct the requested investigations without the disputed item impacting the consumer's credit score while the investigation is open.

The credit industry's trade association directs their furnishers to NOT report any such Compliance Condition Codes in response to an investigation request from a credit bureau. As such, when furnishers receive Automated Consumer Dispute Verification ("ACDV") dispute forms from a credit bureau, they are directed to not report any dispute codes.

When the dispute is received by the credit reporting agency, a code is assigned that indicates the nature of the consumer's dispute. These codes assist the credit bureaus in communicating the type and nature of the dispute to the furnisher and guide (or limit) the investigative actions of the furnisher. For example, the dispute code "001" refers to the situation where the "Consumer says [the account is] not his or hers, Provide or confirm complete ID."

These codes and other consumer information are then pre-populated on a form called an Automated Consumer Dispute Verification and sent to the furnisher via a web-based system called Online Solution for Complete and Accurate Reporting or "e-OSCAR." Recently e-

---

[4] A Compliance Condition Code ("CCC") is one of the variety of codes in the Metro-2 credit reporting language. According to the Credit Reporting Resource Guide, a CCC "allows the reporting of a condition that is required for legal compliance according to the Fair Credit Reporting Act or the Fair Credit Billing Act."

OSCAR has been modified so that documents sent by the consumer to the credit reporting agencies can be attached to the ACDV communication sent to the furnisher of the information. Once the data furnisher receives the ACDV via the e-OSCAR system, they can see the name and identification of the consumer, as well as the nature of the dispute.

The data furnisher usually has 30 days to determine if the consumer's dispute requires a modification to his or her credit report or if the challenged item is accurate. Either way, the data furnisher should fill out the "response" portion of the ACDV form with directions to modify the item, delete the item, or leave the item unchanged. The data furnisher's response is sent back the credit bureaus via e-OSCAR. Once the credit bureaus receive the data furnisher's response, they will modify, delete, or do nothing to the entry.

The credit bureau then sends or causes to be sent correspondence, usually by mail, to the consumer with the results of the investigation. Under the Fair Credit Reporting Act, this entire process may take up to 45 days, although the Consumer Data Industry Association (CDIA) reports that the process generally takes less time thanks to automation.

**Credit Repair and Jamming**

It is not uncommon for consumers to hire 3rd party companies to attempt to have negative information removed from their credit reports prematurely and under false pretenses. These Credit Repair Organizations or Credit Services Organizations charge fees to dispute information on consumer credit reports, a process the credit reporting industry's trade association has referred to as "Jamming." According to Stuart Pratt, former President of the credit reporting industry's trade association, between 30-50% of all consumer disputes are being submitted by credit repair companies, most of them frivolous attempts to have accurate but negative information removed from consumer credit reports.

More recently, credit repair organizations have cultivated relationships with Plaintiffs' attorneys and serve as lead generators for potential FCRA, FDCPA or other forms of consumer litigation. These relationships are borne out of connections via Facebook groups, as well as via credit repair related conventions, where Plaintiffs' attorneys are commonly present as either guest speakers or event sponsors.

### 7.    The Fair Credit Reporting Act, Adverse Action and Risk Based Pricing Notices and Investigations

The Fair Credit Reporting Act ("FCRA") is the federal statute that defines, among other things, when credit reports can be accessed, consumer's rights, obligations of the credit bureaus and their data furnishers to perform reasonable investigations, and various notice requirements.

For example, when a consumer applies for and is denied a loan or credit card because of information on his or her credit report, including a credit score, the lender is required by the FCRA to provide a notice of adverse action, more commonly referred to as a declination letter. This letter is not optional but is rather auto-pilot, meaning the applicant doesn't have to overtly request the letter after they've been denied.

The notice must contain certain elements including the applicant's credit score, from what credit bureau the lender obtained the credit report, the credit bureau's address, and a notice of a consumer's right to obtain a free copy of their credit report because of the declination.

Further, when a consumer applies for and is adversely approved[5] for a loan or credit card because of information on his or her credit report, including a credit score, the lender is required by the FCRA to provide a Risk Based Pricing notice. This letter, like the adverse action letter, is auto-pilot. The absence of adverse action or risk based pricing notices means the applicant was approved and given a lender's best or near best available terms.

The FCRA also obligates the credit reporting agencies and their data furnishers to perform investigations when they've been put on notice that the consumer challenges the accuracy of information on their credit reports.  There is no statutory standard of what constitutes a "reasonable" investigation in the FCRA and what is reasonable will depend on the facts and nature of the consumer's dispute.

Most furnishers of information will review the dispute form submitted by the credit bureaus, review their internal records, access multiple systems containing account related information, and will also have access to review any attachments to the dispute which the consumer may have included with their communication to the credit bureau(s). This is a common method of investigation by a furnisher.

States have also legislated in the consumer credit reporting area, including California with its Consumer Credit Reporting Agencies Act ("CCCRAA"). Among other things, the CCCRAA prohibits a data furnisher from furnishing information on a specific transaction or experience if the furnisher knows or should know the information is incomplete or inaccurate.

> **B.      Opinion #1 – Metro 2 is the one and only credit reporting language used by the credit reporting agencies and their data furnishers. In Metro 2 there is no such field or date as a so-called "Date of Status." Because there is no such "Date of Status", furnishers like Chase cannot report, update, delete, investigate, or modify a "Date of Status."**

The credit reporting industry has a long standing, universally accepted, and well established credit reporting language whereby tradeline and collection account information is reported or "furnished" to credit bureaus by lenders, servicers and debt collectors (collectively "furnishers" or "data furnishers.") This credit reporting language is formally referred to as "Metro." The credit reporting industry is currently using the second generation of Metro, which is called Metro 2. Metro 2 has been available for use since before the turn of the century and as of June 2018 it became the one and only language available for furnishing information to the credit bureaus as the original Metro language was decommissioned.

The Metro 2 language is communicated by the credit industry to their furnishers via a standards manual called the Credit Reporting Resource Guide ("CRRG"), which is also informally referred to as the Metro 2 manual. Each year a new edition of the CRRG is pub-

---

[5] An Adverse Approval is an approval for credit, but not with the lender's best terms.

lished by the credit industry's trade association, the Consumer Data Industry Association ("CDIA"). The new editions are almost entirely redundant to the prior year's version, although there are meaningful changes from time to time.

The CRRG, which is roughly 290 pages, provides the Metro 2 credit reporting options/codes available to furnishers to use when they credit report information to the credit bureaus. The CRRG also includes direction as to when to use certain codes, and when to not use certain codes. The Metro 2 language/codes included in the CRRG represents the entirety of credit reporting options available to data furnishers, like Chase.  Point being, if a date, field, code, or character is not in the CRRG then furnishers cannot report, modify or delete said information to or from a consumer's credit report.

In Metro 2 there is **no such date called the "Date of Status."** It does not exist. There is no reference to a so-called Date of Status anywhere in the CRRG.  There is also no reference to a so-called Date of Status data field in any of the standard dispute resolution forms used in the credit industry. There is no systemic method for any data furnisher to credit report, update, modify or delete a so-called Date of Status. The Plaintiff is essentially complaining that Chase updated or changed a date they have no knowledge of or control over.

Instead, the credit reporting agency Experian has a data field called the Date of Status[6] on their consumer disclosure credit reports.[7] And, according to Experian "it is possible for the Date of Status...to change, if the previously reported or **verified** dates change."[8] Because the Plaintiff caused 39 disputes to be sent to Chase, Chase **verified** the Plaintiff's subject credit card accounts numerous times, as is their obligation under the Fair Credit Reporting Act.

As such, each time the subject Chase accounts were verified, Experian unilaterally updated their own internal "Date of Status" again and again. Essentially the Plaintiff caused Experian to continue to update their own internal Date of Status because she chose to submit repetitive and numerous disputes to credit reporting agencies about her valid Chase accounts.

Chase had no involvement in any such Date of Status update. It appears, according to Experian's Declaration, that Experian chooses to change their own Date of Status, which appears on their consumer disclosures, when one of their data furnishers responds to a consumer's indirect dispute. Certainly, the Date of Status has nothing to do with Chase or any other of the 10,000+ credit data furnishers.

It appears in the Plaintiff's various Complaints that she wanted Chase to remove or backdate the so-called Experian Data of Status. This was and is a systemic impossibility. Because there is no such thing as a Date of Status in Metro 2 or furnished by Chase, Chase has no

---

[6] See Declaration of Mary Methvin, para 7.

[7] Disclosures are reports that are only available to consumers, normally via a website like Experian.com. Disclosures are more fully discussed in Opinion #3 of this Expert Report.

[8] See Declaration of Mary Methvin, para 7.

systemic control over the date, including any ability to remove, backdate, correct, or investigate a so-called Date of Status.[9]

According to David Rivera, who manages Chase's credit reporting dispute process...

"We don't have that field (date of status) in our ACDV forms or AUDs in how we communicate with the CRAs (Credit Reporting Agencies).[10]

"We don't have a policy or procedure to it (investigating a date of status) because it's not a part of our information we share with the CRAs."

Question: And the date of status, I think we covered, was not something that Chase furnishes.

Answer: "Correct."[11]

Mr. Rivera cannot identify a Chase policy with respect to the Date of Status, or identify a Date of Status field on any of the dispute/resolutions forms used in the credit industry because the Experian Date of Status doesn't exist outside of Experian's consumer disclosure reports.

    **C.**    <u>**Opinion #2**</u> **– Chase is directed by the credit industry's trade association, via their Credit Reporting Resource Guide standards' manual, to not mark accounts as being "in dispute" in response to indirect disputes filed with credit reporting agencies.**

The Plaintiff, in her Second Amended Complaint, suggests Chase "failed to mark the tradeline as in dispute on the credit report" after Plaintiff filed disputes with Experian "in a letter dated August 19, 2017" and another letter dated "October 21, 2017."[12]

This assertion in the Second Amended Complaint suggests Chase failed at some duty it had with respect to marking their tradelines at issue in this lawsuit as being "in dispute" after numerous and repetitive disputes had been filed by the Plaintiff directly with credit reporting agencies. To the contrary, Chase (and all other data furnishers) is explicitly directed by the credit industry's trade association to **not** mark accounts as being "in dispute" when they receive indirect disputes[13] from one or more of the consumer credit reporting agencies.

In early 2017 the Consumer Data Industry Association ("CDIA") made it known that they would be sending an off-cycle update to their credit reporting industry standards in mid

---

[9] See Chase's Responses to Interrogatories, numbers 3, 4, 10, 11, 12, and 14.

[10] ACDVs and AUDs are the industry standard forms used to communicate dispute/resolution changes to the credit bureaus. These forms have been in use for well over three decades.

[11] See pages 16, 25, and 73 of David Rivera's deposition.

[12] See Second Amended Complaint, paras 14-15.

[13] An Indirect Dispute occurs when a consumer files a dispute with one or more of the credit reporting agencies and the credit reporting agency then sends dispute forms (ACDVs) to the data furnisher.

2017, and in advance of the publication of their full 2017 Credit Reporting Resource Guide. This off-cycle update would direct furnishers of credit information to the credit bureaus, like Chase, to **not** report Compliance Condition Codes[14], what Plaintiff refers to as "in dispute" in her Second Amended Complaint, when they receive indirect disputes from a credit reporting agency.

Even prior to the CDIA's off-cycle update in 2017, furnishers weren't obligated to credit report a tradeline or account as being in dispute unless they received a dispute directly from the consumer, the so-called "direct dispute."[15] And even in the scenario of a direct dispute, the furnisher was not obligated to retroactively update the item as being in dispute on a credit report simply because they received a direct dispute from a consumer. Instead, they were only obligated to report the item as being in dispute if they were continuing to credit report their tradeline, which Chase was not.

As such, the Plaintiff is complaining about something Chase, and all furnishers of information to the credit bureaus, is directed to **not** do by the credit reporting industry.

### D.    Opinion #3 – There is no evidence the Plaintiff experienced any damages as a result of Chase's actions, including any negative impact to her credit scores.

The Plaintiff suggests that she has suffered "actual damages as a result of having her credit report filled with trade lines with incorrect date of status information lowering her credit score and giving third parties the assumption that she is not creditworthy."[16] This is demonstrably false. In fact, Plaintiff's counsel represented to the court that the Plaintiff doesn't have actual damages and the Plaintiff further testified at her deposition that she didn't have any actual damages.[17]

As previously addressed, there is no such thing as a "Date of Status" in the Metro 2 credit reporting language. As such, there is no such thing as a "Date of Status" appearing on the actual consumer credit report available to lenders for underwriting. Because there is no such data field appearing on a consumer's actual credit report, there is no systemic possibility that credit scoring systems, such as those developed by FICO®, can be impacted by a non-existent date.

As such, the Plaintiff's credit scores were not impacted by the Date of Status because there is no Date of Status on a credit report. Thus, a credit scoring model which is entirely dependent on the information in an actual credit report, doesn't have access to a so-called Date of Status and cannot be influenced, either positively or negatively, by a so-called Date of Status.

---

[14] A Compliance Condition Code is a Metro 2 credit reporting code used to indicate that a tradeline or collection account is in dispute.

[15] A Direct Dispute occurs when a consumer circumvents the credit reporting agencies and communicates their dispute directly to the data furnisher.

[16] See Plaintiff's Responses the Chase's Interrogatories, number 8.

[17] See deposition of Emily Coulter, page 59.

## Consumer Disclosures versus Credit Reports

The reports produced in the documents of record in this lawsuit are largely made up of two categories of reports; consumer disclosures and credit reports. These two report styles are not the same, although the terms are often incorrectly used interchangeably. Disclosures are designed for and available only to consumers. Credit reports are designed for and are only available to users of credit reports, like banks and credit card issuers.

Disclosures are cosmetically designed for consumers to read/understand and are not in the Metro 2 credit reporting language. They are available from various consumer facing websites, like Experian.com. They contain plain language, are often color coded, and contain legends and "how to read" instructions. Chase does not provide the information that appears on a consumer disclosure style report, such as a so-called Experian Date of Status.

Alternatively, credit reports are designed for use by lenders for the purposes of risk assessment. Credit reports are also the basis for consumer credit scores, like FICO scores. Credit reports are delivered to users in the Metro 2 language and include the Metro 2 information provided by furnishers.

Finally, consumer disclosure reports are not available to lenders and credit reports are not available to consumers.

## Meaningful Dates on Actual Credit Reports

There are only three dates associated with tradelines that are meaningful to credit scoring systems that are controlled by furnishers. Those dates are the "Date Opened", the "FCRA Compliance Date of First Delinquency" (DoFD), and the dates associated with late payments, if any.  None of these aforementioned three dates has anything to do with the so-called Date of Status that appears on Experian's disclosures. There is no correlation between a Date of Status and any meaningful dates that appear on real credit reports. They are not influential to each other or influenced by each other in any way.

All tradelines have a "Date Opened", establishing when a lender opened or onboarded an account for a borrower. This date is used for the various age related metrics in credit scores. And, only tradelines that have late payments will include dates identifying when those late payments occurred.

Finally, only tradelines that have reached some sort of terminal status, such as the two Chase accounts at issue in this lawsuit, will have a DoFD. The DoFD serves two purposes. The first is to establish the "anchor date" or the date from which the credit bureaus determine obsolescence as they must remove such derogatory entries after no longer than seven years.

The second purpose, which is at issue in this lawsuit, is the derogatory entry's impact on credit scores.  The DoFD is used by FICO's credit scoring systems to determine the age of the negative entry, and thus influences its impact on the consumer's credit score.

Generally, the DoFD cannot be updated unless it is legitimately incorrect. Incorrectly updating the DoFD to make it more current will cause the derogatory entry to remain on a credit report longer than allowed by law, and it will also cause credit scoring systems to believe it is newer than it actually is, thus potentially lowering a consumer's credit scores. This incorrect updating of the DoFD is called "re-aging," which is a term incorrectly used by Plaintiff's counsel in his original Complaint.[18]

Even though the Plaintiff caused 39[19] disputes to be sent to Chase regarding her two accounts, which is clearly an attempt at "jamming"[20], Chase never caused the DoFD to be changed to a more current date. Chase always reported the DoFD as being April 2015.[21] As such, any alleged change to the Plaintiff's credit scores was not caused by Chase's responses to Plaintiff's repetitive disputes, but rather by some other unidentified reason.

In addition to not being influential to any credit scoring systems, the so-called Date of Status would also never be seen by any lender or user of credit reports, because it does not exist outside of the Experian consumer disclosure reports, which are not available to anyone other than consumers. As such, there is no chance a user of credit reports would be somehow fooled or confused into thinking the Plaintiff has two newer discharged Chase accounts on her Experian credit report.

*      *      *      *      *

This expert report is based on my 27+ years of experience and knowledge gained as a professional in the consumer credit industry, specifically as an employee or contractor of Equifax Credit Information Services, Fair Isaac Corporation, Credit.com, and Credit.com Educational Services, on my review of relevant documents produced in this matter, and as a result of my previous expert witness work, which includes more than 370 cases. All of my comments are accurate to the best of my knowledge as of the time I prepared this report. All of the opinions and comments stated in this report are expressed to a reasonable degree of professional certainty.

I reserve the right to supplement or amend my opinions. I declare that the foregoing is true and accurate to the best of my ability based on the documents I have reviewed, my education, my experience, my training, and my expertise.

Executed this 17th day of June 2019,
in Atlanta, Georgia


John Ulzheimer

18 See Complaint, para 21.

19 See deposition of David Rivera, page 50, and Chase's Responses to Plaintiff's Interrogatories, number 4.

20 See page 11 of this Expert Report.

21 By way of example, see Experian 275, 276, 277, 278, 280, 281, 283, 284.

**Exhibit A**

## John Ulzheimer

**The Ulzheimer Group, LLC, President**
**1160 Buckhead Valley Court**
**Atlanta, Georgia 30324**
**(404) 636-3737**

John Ulzheimer, President of The Ulzheimer Group, LLC and Founder of www.creditexpertwitness.com, is a nationally recognized expert on credit reporting, credit scoring and identity theft. In addition, his expertise includes FCRA, FDCPA, CROA, credit report damages and the resulting economic damages. He serves as an expert witness/legal consultant for those involved in credit related litigation and has been qualified and admitted as an expert in Federal and State court.

John is <u>twice</u> FCRA certified by the Consumer Data Industry Association (the trade association of the credit reporting agencies) and has 27+ years of experience in the consumer credit industry including positions with Equifax Credit Information Services (6 years), Fair Isaac, which is the inventor of the FICO® credit scoring system (7 years), Credit.com (6 years), and years of concurrent work with a number of consumer credit related companies.

John currently is or was the credit blogger for the New York Times, Mint, CreditSesame, CreditSimple, Zillow, JD Byrider Systems, Credit.com, SmartCredit, VantageScore Solutions, The Simple Dollar and the National Foundation for Credit Counseling. John has been published over 4,500 times in the past 14 years on the topic of consumer credit. He has authored or co-authored numerous educational materials on the subject including:

- The book, *The Smart Consumer's Guide to Good Credit*
- The book, *You're Nothing but a Number, Why achieving great credit scores should be on your list of wealth building strategies.*
- The consumer handbook, *Surviving Identity Theft.*
- The consumer handbook, *The Get Credit Wise ToolKit*
- *Use of Compliance Condition Codes,* CO Bar Association Newsletter

**Relevant Experience at Equifax** – Managed consumer dispute process including consumer interview, logging consumer dispute onto credit report, communicating with data furnisher to validate credit file accuracy, modified consumer credit report according to results of investigation, and communicate dispute resolution results to consumers.

Managed relationship between Equifax and thousands of small customers, such as credit unions, car dealerships, banks, and collection agencies. Role included pricing negotiations, cross selling credit products including Credit Marketing Services, credit scores, fraud detection services and data access software.

Managed relationship between Equifax and large strategic clients based in Jacksonville, Florida including large regional bank and national credit card issuer. Role included pricing negotiations, cross selling credit products including Credit Marketing Services, and credit scores.

**Relevant Experience at Fair Isaac** – Supported all of Fair Isaac's credit bureau based scores sold by North American credit reporting agencies; Equifax, Equifax Canada, TransUnion, TransUnion Canada, and Experian. Managed credit score pricing for several years. Well versed in credit score validations, impact analyses, score migration studies, credit scorecard development and what influences credit scores. Performed hundreds of credit score trainings to audiences of all levels of sophistication including lenders, credit bureaus, and members of Congress, consumer groups and consumers.

John frequently appears on CNBC, FOX News, CNN and NPR. He has contributed content for CNBC's "On The Money", Freddie Mac's "Know Your Score" campaign, Oprah's "Debt Diet" series and The Suze Orman Show. He is also a frequent commentator on credit-related issues in various outlets including USA TODAY, Associated Press, CNBC, NPR, Los Angeles Times, CNN, FOX, Washington Post, Money Magazine, American Banker, Wall Street Journal, SmartMoney, MarketWatch, MSNBC.com, The Motley Fool, Chicago Tribune, Bankrate.com, and other regional business and consumer media.

In his hometown of Atlanta, John is regular guest lecturer at The Westminster Schools, The University of Georgia and the Georgia Consortium for Personal Financial Literacy. Between 2004 and 2007 John taught a course on credit reporting and scoring at The Emory University Center for Lifelong Learning and was named by the students the Top Personal Finance and Investments Instructor for the 2005/2006 term. In April 2016 John began guest lecturing at Emory University's School of Law. John graduated in 1991 from The University of West Georgia with a B.S. in Criminal Justice. He is currently a grad student at Penn State.

**Certifications and Awards:**

**FCRA Certified – Consumer Data Industry Association - 2011. Perfect score on certification test.**

**Associate Credit Executive – International Credit Association. 1997.**

**FCRA Certified – Associated Credit Bureaus - 1992.**

**Consumer Credit Interviewer – Designation Conferred by Equifax as part of their employee training program.**

**Graduate – American Bankers Association School of Bankcard Management held at The University of Delaware – 2000**

**2014 Consumer Advocate Award – National Foundation for Credit Counseling.**

## Exhibit B

### Expert Testimony in the Last Four Years

*Noori v Bank of America* – Deposition (USDC Cent Dist of CA, cv15-01467-AB)
*Kealy v Ford Motor Credit* – Deposition, Trial (Sup Ct of CA, LA County BC497696)
*Best v Bluegreen* – Deposition (USDC So Dist of FL 14-80929-civ-cohn)
*Callaly v Lieberman Management* – Deposition (Circ Ct, Du Page Co, IL. 11L545)
*Vasquez-Estrada v Collecto, Inc* – Deposition (USDC Dist of OR, 3:14-cv-01422)
*Boydstun v US Bank* – Deposition (USDC Dist of OR, Portland Div 3:11-cv-429)
*Duell v FNBO* – Deposition (USDC So Dist of CA, 14-cv-2774)
*Daugherty v Equifax, et at* – Trial (USDC So Dist of WV, Beckley Div 5:14-24506)
*Neal v Trans Union, et al* – Deposition (USDC West Dist of MO, 6:15-cv-03474)
*Barakat v Capital One, et al* – Deposition (USDC East Dist of MI, 16-cv-10718)
*Harrah v SLS* – Deposition (USDC East Dist of VA, 4:15cv95)
*Robinson v Wells Fargo* – Deposition (USBC Southern Dist of TX, 14-03290)
*Thompson v Wells Fargo* – Deposition (Jefferson Circuit Court, Div 6, 11-CI-04347)
*Jones v PHEAA* – Deposition (USDC Cent Dist of CA, 2:16cv-00107)
*Ogden v International Paper* – Deposition (Dist Ct of Jefferson Co., TX B-195,960)
*Bastek v Comenity Bank* – Deposition (Sup Ct of CA, San Diego Division, 37-2016-17012)
*Filion v Wells Fargo* – Deposition, Trial (Sup Ct of CA, Ventura Co, 56-2013-00424511)
*Robbins v CitiMortgage* – Deposition (USDC Northern Dist of CA, 16-cv-4732)
*Kamimura v Ditech* – Deposition (USDC Dist of NV, 2:16-cv-00783)
*Kim v PHEAA* – Deposition (USDC So Dist of CA, 3:17-cv-00528)
*Anderson v Wells Fargo* – Deposition (USDC No Dist of TX 3:16-cv-2514)
*Williams v Goodman* – Deposition, Trial (3rd Judicial Circuit, Columbia Co, FL 14-158-CA)
*Barnum v Equifax* – Deposition (USDC Dist of NV 2:16-cv-02866)
*Bryant v Anderson* – Deposition (Circuit Ct of Jasper Co, MO, No. 16AO-CC00238)
*Neal v Westlake Financial* – Deposition, Arbitration (JAMS Ref. No. 11100198687)
*Rennick v Equifax* – Deposition (USDC Middle Dist of Fl., 8:17-cv-01617)
*Liera v US Bank* – Deposition (USDC Cent Dist of CA., CV17-603 CJC)
*Morris v Carrington Mortgage* – Deposition (USDC Dist of NV., 2:18-cv-01829)
*McCullough v US Bank* – Trial (Sup Ct of CA, Marin Co., CIV1702928)
*Littlejohn v Vivint Solar* – Deposition (USDC Dist of NJ., 1:16-cv-09446)

**Exhibit C**

## Documents Reviewed

Complaint
Second Amended Complaint
Chase's Answer to Second Amended Complaint
Document Labeled "Experian 1-330"
Declaration of Mary Methvin
Plaintiff's Response to Experian's Request for Production of Documents
Plaintiff's Response to Chase's Request for Production of Documents
Plaintiff's Answer to Experian's Interrogatories
Plaintiff's Answer to Chase's Interrogatories
Plaintiff's Document Production
Experian's Responses and Objections to Plaintiff's First Request for Production
Experian's Responses and Objections to Plaintiff's First Request for Admission
Experian's Responses and Objections to Plaintiff's First Set of Interrogatories
Chase's Responses and Objections to Plaintiff's First Request for Production of Documents
Chase's Responses and Objections to Plaintiff's First Request for Admissions
Chase's Responses and Objections to Plaintiff's First Set of Interrogatories
Depositions of David Rivera, Ramsey Coulter, and Emily Coulter